**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WILLIAM HOUSTON,

          Plaintiff

     vs.

EASTON AREA SCHOOL DISTRICT,

          Defendant

Civil Action

No. 03-3494

Henry S. Perkin
United States Magistrate Judge

**MEMORANDUM OPINION AND VERDICT**

       The Plaintiff, William Houston ("Plaintiff" or "Mr. Houston"), filed this action against his former employer, the Easton Area School District ("Defendant" or "EASD").  Mr. Houston claims that the Defendant engaged in racial discrimination when it refused to pay him a sum equal to one hundred (100%) percent of the value of his unused sick days at the time of his retirement.  The case was tried before me without a jury.  In addition to the testimony, depositions and exhibits presented at trial, the parties stipulated that the transcript of proceedings of a non-jury trial in the matter of *Roger J. Wrazien v. Easton Area School District* was to be considered ("Wrazien Transcript"), in full, as evidence in the trial of this case.[1]

---

[1]*Roger J. Wrazien v. Easton Area School District* ("EASD"), Northampton County, No. C-48-CV-2001-7915, was a case tried before the Honorable Anthony S. Beltrami, Judge of the Court of Common Pleas of Northampton County.  In that case, Roger Wrazien sued the EASD for payment of the value of one hundred (100%) percent of his unused sick days at the time of his retirement.  As discussed in this Memorandum, Mr. Wrazien is a comparator for the purpose of determining disparate treatment by the Defendant based upon a claim of race discrimination.  Mr. Wrazien prevailed in his claim against EASD.  This determination was affirmed by the Commonwealth Court of Pennsylvania.  *Wrazien v. Easton Area Sch. Dist.*, 926 A.2d 585 (Pa. Cmwlth. Jun. 18, 2007)(No. 1891CD2006), *appeal denied*, 937 A.2d 448 (Pa. Dec. 4, 2007)(Table, No. 598 MAL 2007).

I.      **PROCEDURAL HISTORY**.

        Mr. Houston asserts a claim under Title VII of the Civil Rights Act of 1964

["Title VII"], as amended, 42 U.S.C. § 2000e *et seq*.  This case was originally assigned to the

calendar of the Honorable James Knoll Gardner.  On February 10, 2004, the parties consented to

a trial before a United States Magistrate Judge.  Upon the order of Judge Gardner, this matter was

then referred to the Honorable Arnold C. Rapoport for all further proceedings and the entry of

judgment in accordance with 28 U.S.C. § 636© and Federal Rule of Civil Procedure 73.  (Docket

Entry 12.)  On September 16, 2004, Judge Rapoport placed this case in civil suspense pending a

determination by the Commonwealth Court of Pennsylvania of the appeal in *Roger J. Wrazien v.*

*Easton Area School District,* Case No. C0048CV2001007915.[2]  (Docket Entry 28.)  The matter

was removed from civil suspense on November 4, 2004, and the Defendant's motion for

summary judgment was denied on the same date.  (Docket Entries 29, 30.)

        On October 3, 2005, Judge Rapoport entered an order pursuant to the Defendant's

motion in limine, granting the motion in part and denying it in part.  The motion was granted

with respect to alleged "historical inequities," the retirements of Louis Ciccarelli ("Mr.

Ciccarelli"), Karl Hettel ("Mr. Hettel") and Joseph Piazza ("Mr. Piazza"), and any "secret code"

references, including language contained in Mr. Ciccarelli's retirement letter.  The motion was

denied with respect to the retirement package of Roger Wrazien ("Mr. Wrazien") and the

language contained in Mr. Wrazien's retirement letter.  The effect of the determination of the

motion in limine was that the only comparator to Mr. Houston was Mr. Wrazien.  (Docket Entry

38.)

_____

        [2]*See* footnote 1, *supra.*

At the request of counsel, the case was once again placed in civil suspense on January 24, 2006, pending the outcome of the Northampton County case of *Roger J. Wrazien v. Easton Area School District*.  (Docket Entry 41.)  On March 11, 2008, the case was removed from civil suspense.  (Docket Entry 45.)  At the request of the parties, Judge Rapoport referred this case to arbitration.  (Docket Entries 46, 48, 50.)  On July 24, 2008, an arbitration award was entered, and on July 29, 2008, Plaintiff requested a trial de novo.  (Docket Entries 49, 51.)  On July 31, 2008, the case was transferred to the calendar of the undersigned.  (Docket Entry 52.)  On August 6, 2008, Plaintiff moved for reconsideration of Judge Rapoport's October 3, 2005 order partially granting Defendant's motion in limine.  (Docket Entry 55.)  I denied Plaintiff's motion for reconsideration on October 8, 2008 (Docket Entry 64),[3] and trial was held, without a jury, on October 15, 2008.  On November 6, 2008 and December 3, 2008, counsel presented closings and post-trial oral argument.

From the evidence, I make the following:

## II.    FINDINGS OF FACT.

Mr. Houston was employed by EASD from 1964 through August 31, 1998.  (Trial Tr.  66, Oct. 15, 2008.)  According to his resume, Plaintiff served in various capacities with the Defendant, including as a member of the superintendent's Cabinet.  The term "Cabinet" was not an official term used by the Defendant, but referred to the administrative team appointed by the

---

[3]Although I affirmed Judge Rapoport's order deciding the Defendant's motion in limine, the parties agreed at trial that the entire transcript of the proceedings in *Roger J. Wrazien v. Easton Area School District* ("EASD"), Northampton County, No. C-48-CV-2001-7915, was to be introduced as a joint exhibit and was evidence in this case.  The Wrazien Transcript contained testimony regarding the retirements of Messrs. Ciccarelli, Hettel and Wrazien, including language in their retirement letters notifying EASD of their decision to retire.  As a result, I have considered that testimony and evidence in this case notwithstanding Judge Rapoport's order and my denial of reconsideration.

superintendent.  (*Id.* at 85.)  Plaintiff was appointed to the Cabinet by Superintendent Joseph

Piazza in 1995 and continued to serve in that capacity through the administration of

Superintendent Bernadette Meck until his retirement in 1998.  (*Id.* at 67.)

Plaintiff was the first African American appointed to the EASD Cabinet.  (*Id.* at

70.)  Only one other African American has served in the Cabinet since Plaintiff's retirement.  (*Id.*

at 90.)  Plaintiff's Cabinet position was head of Custodial/Maintenance.  Pl.'s  Ex. 11.  At the

time of Plaintiff's retirement, the Cabinet members were Mr. Houston, Mr. Ciccarelli, Mr. Hettel

and Mr. Wrazien.

Pennsylvania Act 93, 24 P.S. §11-1164, provides a process to set compensation

for certain school district employees ("Act 93 Employees") who are not members of the

bargaining unit for collective bargaining purposes.  (Trial Tr.  13, Oct. 15, 2008.)  When they

served in the Cabinet, Mr. Wrazien and Mr. Houston were Act 93 Employees, but Mr. Ciccarelli

and Mr. Hettel were not Act 93 Employees.  (*Id.* at 13, 22.)  Superintendent Bernadette Meck

operated under the assumption that "personnel directors and business managers can be

remunerated in the same way as the Act 93 package, but not necessarily.  They don't have to be.

It's up to the discretion of the superintendent."  (*Id.* at 28, 29-30.)  Based upon this assumption,

Superintendent Meck authorized payment of a sum equal to the value of one hundred (100%)

percent of Mr. Ciccarelli's and Mr. Hettel's unused sick days at their respective retirements.  (*Id.*

at 28.)

Mr. Wrazien, an Act 93 Employee, was also paid a sum equal to the value of one

hundred (100%) percent of his unused sick days when he notified Superintendent Meck that he

was going to retire on July 2, 1999.  (*Id.* at 30, 81; Pl.'s Ex. 2.)  When Mr. Wrazien retired, he

4

had been on sick leave approved by the school board and had not performed his duties for the

Defendant for a period of one (1) year.  (Trial Tr.  33, Oct. 15, 2008.)  During the time of Mr.

Wrazien's absence from work during that one (1) year period, Superintendent Meck had to

"redistribute his responsibilities to the rest [of the Cabinet]. . . ."  (*Id.* at 34.)  At the conclusion

of his one (1) year of sick leave, Mr. Wrazien informed Superintendent Meck that "he still was ill

and that his doctor was recommending that he stay off, continue his sick leave."  (*Id.*)  Mr.

Wrazien then proposed that instead of taking additional years of sick leave, that Superintendent

Meck consider paying him a sum equal to the value of one hundred (100%) percent of his unused

sick days and he would immediately retire.  (*Id.* at 34.)  Superintendent Meck agreed to Mr.

Wrazien's proposal so that she could hire a replacement for Mr. Wrazien instead of redistributing

his work responsibilities while he continued on sick leave.  (*Id.*)

   Superintendent Meck did not receive any medical report substantiating Mr.

Wrazien's statement that he was still ill when he presented his retirement proposal.  Mrs. Meck

asserted at trial that at the time Mr. Wrazien discussed his retirement with her, she was unaware

that he had been working a part-time job in addition to his employment with the Defendant.  (*Id.*

at 40.)  In fact, Mr. Wrazien had a part-time position as a state officer with the Pennsylvania Fish

Commission, working approximately thirty (30) to forty (40) hours per month from April through

September.  (*Id.* at 44.)  Mr. Wrazien was continuously employed in this part-time capacity on

the weekends during the school year and during the week in the summer months from 1988

through June of 2008, including the one year period when he was on sick leave from the EASD.

(*Id.*)  While Mrs. Meck denied being aware of Mr. Wrazien's state officer job, Mr. Wrazien

testified at trial that Superintendents Maloney, Piazza and Meck were aware of his state officer

job.  (*Id.* at 45.)

   Ken Brown ("Mr. Brown") served as a member of the EASD school board for six

years from 1996 to 2002.  (*Id.* at 49.)  Mr. Brown is also African American.  On August 14,

2001, *The Express-Times* Newspaper published an article regarding the payment of fringe

benefits to retirees of the EASD, including the payment to Mr. Wrazien of a sum equal to the

value of one hundred (100%) percent of his unused sick days.  (*Id.* at 36.)  It was reported in the

article that Bernadette Meck did not remember the arrangements surrounding payment of sums

equal to the value of one hundred (100%) percent of the unused sick days of Messrs. Ciccarelli,

Hettel or Wrazien.[4]  (Pl.'s Ex. 13.)  After he read the newspaper article, Mr. Brown testified that

he contacted Mrs. Meck, who by then had departed EASD.  He asked her why Mr. Houston did

not "get a package," referring to the retirement benefit of payment for the value of one hundred

(100%) percent of his unused sick days.  According to Mr. Brown, the only reason offered by

Mrs. Meck was that Mr. Houston "didn't ask" for the package.[5]  (Trial Tr.  50, 51, Oct. 15,

2008.)

   Michael R. Doyle ("Mr. Doyle") was a member of the EASD school board from

1989 to 1999, which included the time period when Mr. Houston retired.  (*Id.* at 57, 58.)  He

testified[6] that Superintendent Joseph Piazza ("Mr. Piazza"), when he retired in 1996, asked the

school board to pay him and certain people who worked under him a sum equal to one hundred

---

[4]At trial, Mrs. Meck testified that she did not remember telling the newspaper reporter that she did not remember the arrangement for the payment for unused sick days.  (Trial Tr. 37, Oct. 15, 2008.)

[5]Mrs. Meck testified that she did not talk to Mr. Brown or any other board members about the *Express-Times* article.  (Trial Tr. 38, Oct. 15, 2008.)

[6]Portions of Mr. Doyle's April 21, 2005 telephonic deposition were read by counsel into the record at trial, and the entire transcript was offered and accepted into evidence.  (Trial Tr. 56-65, Oct. 15, 2008.)

(100%) percent of the value of their unused sick days.  (Id. at 58.)  According to Mr. Doyle, the school board approved this request because "it was an era of good feeling" and Mr. Piazza had averted a large tax increase for EASD.  (*Id.* at 61.)  Mr. Doyle believed that this group of employees included Messrs. Ciccarelli, Hettel and Wrazien.  (*Id.* at 58-60.)

Mr. Doyle testified that the arrangement concerning the payment of sums equal to the value of one hundred (100%) percent of the unused sick days for the individuals was not included in the board's minutes because "that was an individual private contract that was worked out with the individuals."  (*Id.* at 61.)  Notwithstanding the fact that the school board did not formally approve the enhanced sick day benefit payments, Mr. Doyle stated that it was discussed with the school board.  (*Id.* at 63.)  Although Messrs. Ciccarelli, Hettel and Wrazien all retired after Mr. Piazza and during Mrs. Meck's tenure as superintendent, they received sums equal to the value of one hundred (100%) percent of their unused sick days at the time of their respective retirements because, according to Mr. Doyle, that benefit was negotiated on their behalf by Mr. Piazza in 1996 or 1997.  (*Id.* at 64.)  When Messrs. Ciccarelli, Hettel and Wrazien wrote their individual letter or memo addressed to Superintendent Meck as notice to EASD of their retirement, each stated, "I respectfully request that I be extended the same benefits that have been provided to other Central Office Administrators upon retirement."[7]  Superintendent Piazza and the subject Cabinet members, including Mr. Houston, retired on the following dates:

a.       Mr. Piazza retired on August 31, 1997;

---

[7]This language appears in substantially the same words and form in Mr. Ciccarelli's letter of retirement dated March 2, 1999 and Mr. Wrazien's letter of February 26, 1999.  Mr. Wrazien's memo to Bernadette Meck also stated "Retirement - Medical Benefits".  While reference to this language in the retirement letters was barred by Judge Rapoport's decision on the Defendant's motion in limine, the parties stipulated that the Wrazien Transcript was to be admitted into evidence.  These retirement letters were referred to in the Wrazien Transcript.  As a result, I have considered this language in deciding this case.

b.    Mr. Houston retired on July 10, 1998;[8]

c.    Mr. Hettel retired on April 8, 1999;

d.    Mr. Wrazien retired on July 2, 1999;

e.    Mr. Ciccarelli retired on July 31, 1999.

(Trial Tr. 76-77, 78-79, 82, Oct. 15, 2008; Pl.'s Exs. 2, 9, 10; Def.'s Ex. 7, p. 3.)

Contrary to Mr. Doyle's testimony, former superintendent Piazza testified during his videotaped deposition taken on May 1, 2008 and presented at trial that he negotiated payment for all his accrued sick days only for himself .  (Def.'s Ex. 12; Trial Tr. 92-93, Oct. 15, 2008; Piazza Dep., 5/1/08, p. 7.)    He specifically denied negotiating any benefits for Messrs. Ciccarelli, Hettel or Wrazien because "it was not my role to recommend somebody else's retirement who's going to retire in the future."  (Piazza Dep., 5/1/08 at 9-10, 11.)  When asked whether he had any recollection of discussing with anyone from the school board payment to Wrazien, Hettel and Ciccarelli all of their sick days upon their retirement, he stated "I would state more strongly than that that I did not discuss that with anyone; not that I don't have a recollection.  I did not discuss their particular retirements with any Board members."  (*Id.* at 12-13.)  He also testified that he did not discuss a policy of all cabinet members receiving one hundred (100%) percent of their accrued sick days at the time of their retirement, but merely discussed this benefit as it pertained to himself only.  (*Id.* at 13.)  Mr. Piazza also denied making any representations or promises to the Cabinet members themselves that they would be paid one

---

[8]On February 24, 1998, Mr. Houston submitted to Superintendent Meck notice of his intent to retire on August 31, 1998.  (Pl.'s Exs. 2, 7; Trial Tr. 76, 78, Oct. 15, 2008.)  Subsequently, Mr. Houston submitted correspondence to Mrs. Meck dated June 3, 1998, that his resignation would be effective at the end of the day on July 10, 1998.  (Pl.'s Ex. 9.)  This July 10, 1998 effective date of retirement was received and accepted at a school board meeting on June 8, 1998.  (Pl.'s Ex. 10, Def.'s Ex. 7, p. 3; Trial Tr. 76-77, 78-79, Oct. 15, 2008.)

hundred (100%) percent of their accrued sick days upon their retirement.  (*Id.* at 15.)

        The telephonic deposition testimony of Claudio Cerullo, Ph.D. ("Dr. Cerullo"), taken on April 21, 2005, was also admitted into evidence at trial.  (Pl.'s Ex. 18; Cerullo Dep., 4/21/05, p. 104.)  Dr. Cerullo was an EASD school board member from 1997 to 2001, and served as President in his last year on the school board.  (*Id.* at 6.)  He testified that the school board does not get involved in any negotiation of or contractual obligations involving retirement packages, and does not vote on a retirement package, but rather votes on accepting retirements. (*Id.* at 7-9.)  He generally recalled specific packages being "put together" for Mr. Ciccarelli, Mr. Hettel and Mr. Wrazien, and he recalled a part of those packages as including payment of one hundred (100%) percent of their accrued sick days, but he did not know if these packages were premised on any "deal" made when Mr. Piazza retired, as suggested by Mr. Doyle.  (*Id.* at 9-10, 13-15.)  Dr. Cerullo stated that "it appeared" from the retirements of Messrs. Ciccarelli, Hettel and Wrazien that cabinet members were getting an enhanced package, but he did not know what "deals" were formulated, and "there were rumblings, you know, that certain folks got something and certain folks didn't."  (*Id.* at 16.)  He recalled the packages more clearly for Messrs. Ciccarelli, Hettel and Wrazien because "it was, I don't know, for some reason it's just a lot of rumblings, led to a lot of board members['] dissension with respect to some of those, I guess, intrinsic or extrinsic benefits, if you will."  (*Id.* at 19.)  He did not notice any difference in the benefits between white males and Mr. Houston, but he agreed that all cabinet members should have been treated equally.  (*Id.* at 16-17.)

        Mr. Houston became a member of the Cabinet in 1995 or 1996 and served under Superintendents Piazza and Meck.  (Trial Tr. 67, Oct. 15, 2008.)  In 1998, he decided to retire

from the EASD.  At that time, it was his understanding that he was entitled to receive a sum

equal to the value of twenty-five (25%) percent of his unused sick days.  (*Id.* at 68.)  He had

heard, however, through "scuttlebutt" that some people had received a sum equal to the value of

one hundred (100%) percent of their unused sick days.  (*Id.*)  As a result, he specifically asked

Mr. Hettel, then Director of Personnel for EASD, two or three times whether it was possible for

him to receive a sum equal to the value of one hundred (100%) percent of his unused sick days

upon his retirement.  (*Id.*)  Mr. Hettel told him he would not receive one hundred (100%)

percent, but was only entitled to receive twenty-five (25%) percent.  (*Id.* at 68, 71.)  At the time

of his retirement, Plaintiff was paid $32,919.04, a sum equal to the value of twenty-five (25%)

percent of his unused sick days.  (*Id.* at 69.)

When he retired in 1998, Plaintiff was the first and only African American

Cabinet member.  (*Id.* at 70.)  At that time, Plaintiff assumed that when his fellow Cabinet

members retired, they would also receive a sum equal to the value of twenty-five (25%) percent

of their unused sick days.  (*Id.* at 75.)  Thus, Mr. Houston testified that in his retirement letter

(Pl's Exs. 7, 9), he did not ask for a sum equal to the value of one hundred (100%) percent of his

unused sick days, but he would have done so if he had known that his fellow Cabinet members

received that benefit.  (Trial Tr. 76, Oct. 15, 2008.)

## III.   DISCUSSION.

### A.   Title VII: Race Discrimination.

Title VII of the Civil Rights Act of 1964 reads, in relevant part, that:

(a)  It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual, or

otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely effect his status as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e-2(a) (1982).

In order to establish a claim of race discrimination pursuant to Title VII, the plaintiff first bears the burden of proving a prima facie case of discrimination by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746-2747, 125 L.Ed.2d 401 (1993). Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253, 101 S. Ct. 1089, 1093-1094, 67 L.Ed.2d 207 (1981). Notwithstanding this principle, the ultimate burden of persuading the trier of fact of the defendant's intentional discrimination always remains with the plaintiff. As a result, the plaintiff must prove with substantial evidence that the reasons offered by the defendant were not its true reasons, but were simply a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 506, 113 S.Ct. at 2746-2747.

There are, generally, two ways that a Plaintiff can prove a prima facie case of race discrimination: (1) by direct evidence of discrimination meeting the requirements of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); or (2) by indirect or circumstantial evidence that satisfies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411

11

U.S. 792, 802 (1973).  When there is direct evidence of discrimination, there is no need for the

plaintiff to offer evidence of inferences of intentional discrimination.  An example of such direct

evidence would be comments showing a racial bias or animus.  *EEOC v. Metal Service*

*Company,* 892 F.2d 341 (3d Cir. 1990).

Discrimination claims based on circumstantial evidence brought under Title VII

follow the analytical framework established by *McDonnell Douglas*.  First, Mr. Houston must

establish a prima facie case by showing that: (1) he is a member of a protected class; (2) he was

qualified for his position; (3) he suffered an adverse employment action despite his

qualifications; and (4) the retirement benefit of payment for all unused sick days was provided to

someone who was not a member of the protected class.  *McDonnell Douglas*, 411 U.S. at 802.  If

the Plaintiff succeeds in establishing a prima facie case, the burden then shifts to the Defendant

"to articulate some legitimate, nondiscriminatory reason" for its non-payment to Plaintiff at his

retirement the value of all his accrued unused sick days to Plaintiff.  *Id.*  If the Defendant meets

this burden, the presumption of discriminatory action raised by the prima facie case is rebutted.

*Burdine*, 450 U.S. 248, 255 (1981).  Finally, once the Defendant has advanced a

nondiscriminatory reason for its actions, the burden shifts back to the Plaintiff to prove by a

preponderance of the evidence that the reasons asserted by the employer for the adverse

employment action were not the actual reason for the non-payment of all accrued unused sick

days, but rather was a pretext for racial discrimination.  *McDonnell Douglas*, 411 U.S. at  804.

In other words, the Plaintiff must "point to some evidence, direct or circumstantial, from which a

fact finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons;

or (2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's actions." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

While the burden of production shifts between the Plaintiff and the Defendant, the burden of persuasion remains on the Plaintiff at all times. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 799 n.10 (3d Cir. 2003); *Fuentes*, 32 F.3d at 763. It is not enough that a plaintiff show that an employer's decision was wrong or mistaken. *Fuentes*, 32 F.3d at 765. In order to establish a case of disparate treatment based on race, the Plaintiff must establish that race was a determining factor in the adverse employment action. *Id.* at 764. "A plaintiff's subjective belief that race played a role in an employment decision is not, alone, sufficient to establish an inference of discrimination." *Wilson v. Blockbuster, Inc.*, 571 F. Supp. 2d 641, 647 (E.D. Pa. 2008)(*citing Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000)).

## C. Plaintiff's Prima Facie Case.

Based upon the Findings of Fact, *supra*, I find no direct evidence of racial discrimination. None of the individuals involved in the retirement benefit payment for unused sick days uttered a comment which would show racial animus or an intent to discriminate against Mr. Houston. In fact, several of the witnesses who testified at trial made positive remarks concerning Plaintiff's performance as a Cabinet member. Mr. Houston does, however, establish a prima facie case for discrimination by inference. An analysis under each applicable factor necessary for Mr. Houston to prove an inferential case of racial discrimination follows.

### 1. Member of a Protected Class

There is no dispute regarding whether Mr. Houston is a member of a protected class because he is African American. 42 U.S.C. § 2000e-2(a) (1982).

2.     Qualified for His Position

In this case, Plaintiff's actual job performance or qualifications are not disputed. Mr. Houston was employed by EASD from 1964 through 1998.  During his employment, he held various positions including the position of Maintenance Manager, which placed him as a member of the superintendent's Cabinet, a high level of administrator.  Former Superintendents Piazza and Meck and certain of Plaintiff's fellow Cabinet members testified that Plaintiff's employment performance was satisfactory.  Thus, Mr. Houston meets this qualification prong of the *McDonnell Douglas* test.

3.     Adverse Employment Action

Title VII makes it unlawful to "discriminate against any individual with respect to his *compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.*"  *See* 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Mr. Houston was the only African American member of the EASD Cabinet, and he was not paid a sum equal to the value of one hundred (100%) percent of his unused sick days at the time of his retirement.  Instead, he was told, as an Act 93 Employee, that he was only entitled to receive the value of twenty-five (25%) percent of such sick days.  For prima facie purposes, Mr. Houston has demonstrated that he was treated differently from other Cabinet members and from his comparator, Mr. Wrazien, who was also an Act 93 Employee.  Plaintiff has, therefore, produced sufficient evidence of this element of *McDonnell Douglas*.

4.     Was the Retirement Benefit Provided to Someone Who was Not a Member of the Protected Class?

Evidence related to former Superintendent Piazza and all other Cabinet members

14

who served at the same time as Plaintiff was introduced at trial by the joint submission of the *Wrazien* transcript. (Joint Ex. 1A, 1B.) The previously designated comparator, Mr. Wrazien, received the enhanced retirement benefit of payment for the value of one hundred (100%) percent of his unused sick days. Mr. Wrazien is Caucasian. Thus, Mr. Houston has produced sufficient evidence of the final element of a prima facie case for discrimination, that someone who was not African American, or a member of Mr. Houston's protected class, was provided with a retirement benefit of payment for all of their unused sick days. After applying the principles of *McDonnell Douglas*, I find that Mr. Houston has established a prima facie case of disparate treatment due to his race.

### D.    EASD's Proffered Legitimate, Nondiscriminatory Reason.

Because Plaintiff has made out a prima facie case, the burden of production shifts to the Defendant, which must articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Fuentes*, 32 F.3d at 763. In ruling upon the Defendant's motion in limine, Judge Rapoport found that Mr. Wrazien was the only comparator similarly situated to Mr. Houston because compensation for Mr. Houston and Mr. Wrazien was governed by Act 93, while compensation for Mr. Ciccarelli and Mr. Hettel was not governed by Act 93. The Defendant's policy was to pay Act 93 Employees a sum equal to the value of twenty-five (25%) percent of their unused sick days at retirement. No such limitation existed for non-Act 93 Employees, such as Mr. Ciccarelli and Mr. Hettel. Bernadette Meck testified that she had the authority, as EASD's superintendent, to modify payments for unused sick days upon employee retirement if she believed the circumstances warranted modification.

Bernadette Meck, in using her discretion, decided to pay Mr. Wrazien, an Act 93

15

Employee, a sum equal to the value of one hundred (100%) percent of his unused sick days at retirement.  Thus, in Mr. Wrazien's case, she modified the policy of only paying Act 93 Employees the value of twenty-five (25%) percent of their unused sick days at retirement based upon her impression that Mr. Wrazien suffered from a serious medical condition, Amyotrophic Lateral Sclerosis ("ALS").[9]  Mr. Wrazien had been absent from work on medical leave for one year when Mrs. Meck made the decision to pay him the value of one hundred (100%) percent of his unused sick days.  He sought permission to take medical leave for an additional year, and he had accrued a sufficient amount of unused sick days to apply to such leave.  From a personnel perspective, the decision facing Mrs. Meck was an obvious one.  If she allowed Mr. Wrazien to retire and pay him for all of his unused sick days, she would be able to immediately hire or promote his replacement and shift his responsibilities as director of elementary education back from the other two Cabinet members who were "covering" his responsibilities.  However, if Mr. Wrazien exercised his remaining leave as medical leave, he would remain on the payroll and EASD would not only have to pay Mr. Wrazien for that time, it could not immediately replace him.  By allowing Mr. Wrazien to immediately retire with this enhanced benefit, the Defendant could fill Mr. Wrazien's position, which relieved other personnel from performing his duties.  I find this to be a legitimate, nondiscriminatory reason for treating Mr. Wrazien differently from Mr. Houston and allowing Mr. Wrazien to retire with payment for all of his unused sick days.

### E.      Was EASD's Asserted Reason for Treating Plaintiff Differently a Pretext?

Because EASD has identified a legitimate, nondiscriminatory reason for its action,

---

[9]Amyotrophic Lateral Sclerosis ("ALS") is a rare fatal progressive degenerative disease that affects pyramidal motor neurons, usually begins in middle age, and is characterized especially by increasing and spreading muscular weakness - called also Lou Gehrig's disease.  *Merriam-Webster's Medical Dictionary* 27 (1995).

the burden shifts back to Mr. Houston to show that EASD's reason for not paying him for all of

his unused sick days at retirement is merely a pretext for EASD's racial discrimination.  Mr.

Houston asserts that the reason presented by EASD for the disparate treatment authorized by

Mrs. Meck was a mere pretext for racial discrimination.  According to Mr. Houston, the true

reason for this treatment was the Defendant's intent to treat him differently from Mr. Wrazien

because he is African American.  In support of this contention, Plaintiff argues that Mr. Wrazien

presented no documentary evidence to Mrs. Meck regarding his medical condition when he

proposed the retirement arrangement, and Mrs. Meck demanded no such evidence.  Plaintiff also

notes that although Mrs. Meck testified that she was unaware that Mr. Wrazien worked part-time,

Mr. Wrazien testified that the EASD was aware that he had performed these part-time duties

since 1988, notwithstanding his illness.

　　　　　While it may have been imprudent business conduct on the part of Mrs. Meck not

to require medical certification of Mr. Wrazien's medical condition precipitating his retirement,

her failure to obtain such medical confirmation does not demonstrate that the reason provided by

EASD was a mere pretext for discrimination.  "Plaintiff cannot prevail under Title VII merely by

establishing that the employer made a decision that was wrong or mistaken."  *Bray v. Marriott*

*Hotels*, 110 F.3d 986, 990 (3d Cir. 1997).  Mr. Houston retired in 1998, months before Mr.

Wrazien approached Mrs. Meck regarding his proposal to retire.  Since Mr. Wrazien is Mr.

Houston's comparator and a fellow Act 93 Employee, there is no evidence that the Act 93 policy

of paying Mr. Houston, as an Act 93 Employee, the value of twenty five (25%) percent of unused

sick days was disparate treatment of Mr. Houston, let alone disparate treatment due to his race.

Mrs. Meck was confronted with the facts of Mr. Wrazien's retirement well after Mr. Houston

17

retired.  The evidence presented points to her decision-making process as focused on Mr.

Wrazien's medical and individual personnel situation, not on Mr. Houston's race.  While her

decision-making process may have been flawed, it is not evidence of race discrimination.

Indeed, "it is not the role of the Court to sit as a 'super-personnel department' when reviewing an

entity's business decisions; the Court asks only whether a decision is discriminatory."  *Wilson*,

571 F. Supp.2d at 652 (*citing Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir.

1995)).

Mr. Houston also asserts that nebulous language in the retirement letters of

Messrs. Ciccarelli, Hettel and Wrazien shows that the asserted reason for Mr. Wrazien's

enhanced retirement benefit was a pretext.  The language used was, "I respectfully request that I

be extended the same benefits that have been provided to other Central Office Administrators

upon retirement."  Mrs. Meck interpreted these words as a request for payment of the value of

one hundred (100%) percent of the requester's unused sick days.  After reviewing all of the

testimony presented on this point, I believe that the language utilized in Mr. Wrazien's retirement

letter was intentionally vague.  I do not, however, find that it was used to advance disparate

treatment against Mr. Houston based on his race.  Since certain school board members were

unaware of Mrs. Meck's decision to pay Mr. Wrazien the enhanced retirement benefit, and

because the minutes of EASD's school board meetings were silent regarding details of this

benefit award, the only conclusion which can be reached is that the vague language was utilized

to keep the details of and monetary impact of the award out of the EASD school board meeting

minutes and away from public scrutiny.  Plaintiff points to Mrs. Meck's vague and evasive

response when confronted with the newspaper article discussing the enhanced benefits paid to

18

Mr. Wrazien to support this conclusion.  Nonetheless, based on the information provided, I cannot find that the reason for such language was racially motivated or for the advancement of disparate treatment against the Plaintiff.

        Mr. Houston also contends that the proffered legitimate, nondiscriminatory reason presented by Defendant is directly contradicted by the testimony of Mr. Doyle, and therefore it cannot be a legitimate reason for not awarding him the value of all of his accrued sick days at his retirement.  Plaintiff points to *St. Mary's Honor Ctr. v. Hicks*, in which the Supreme Court stated that if a trier of fact concludes that the testimony of a defendant is not credible, it *may* infer that the Defendant committed an illegal act.  509 U.S. at 511 (emphasis added).  However, this Court is not *required* to infer that the Defendant committed an illegal act pursuant to *St. Mary's Honor Ctr. v. Hicks,* even if it concludes that Mr. Doyle's testimony is credible.  Despite Plaintiff's argument, this Court does not find Mr. Doyle's testimony that "we agreed to give [Mr. Piazza] a hundred percent return on his sick days *for a number of other people retiring at exactly the same time*." (Trial Tr. 58, Oct. 15, 2008)(emphasis added), to be wholly accurate based upon Mr. Wrazien's retirement one year after Mr. Houston's retirement.  Although Mr. Doyle may have testified according to his personal recollection, the following language he employed during his deposition lessens his credibility: "Now, I have no exact memory of Mr. Houston's case but I do have a pretty good recollection of the case" (*Id.* at 58); "I'm going to guess that we are in '96 and it could have been '97" (*Id.*); "I think it -- I think it's '96" (*Id.*);  "I believe that was the case.  I know that at the time I'm under the impression that I wasn't in favor of it and had to be persuaded, and I was eventually"  (*Id.* at 59.); "I can't for sure give you all of them but with this thing in front of me I can remember some of them, I think.  I know Mr. Ciccarelli was one of

19

them.  I believe I know." (*Id.*)   Because I find the testimony presented on behalf of the

Defendant is more credible than Mr. Doyle's testimony, I cannot find that the proffered reasons

presented by Defendant are a pretext for discrimination against Mr. Houston.

Moreover, the allegedly successful negotiation of the enhanced retirement benefit

by Mr. Piazza for himself and others still does not support Plaintiff's theory that any negotiation

was done for the purpose of excluding Mr. Houston on the basis of his race.  "It is axiomatic that

to prevail at trial, the plaintiff must convince us *both* that the reason given by the employer was

false *and* that discrimination was the real reason for the decision."  *Noel v. Boeing Co.*, Civ.A.

No. 06-CV-2673, 2008 WL 1999757, at *15 (E.D. Pa. May 8, 2008) *(citing Fuentes*, 32 F.3d at

763).  Because there is no evidence to suggest that EASD was racially motivated to not award

Mr. Houston the value of all of his accrued sick days at the time of his retirement, we must find

that Mr. Houston has failed to prove his case pursuant to Title VII for racial discrimination.

Accordingly, judgment shall be entered in favor of Defendant on Plaintiff's claim.

## IV.   CONCLUSIONS OF LAW.

Mr. Houston has presented, by a preponderance of the evidence, a prima facie

case of a violation of Title VII, 42 U.S.C. § 2000e, *et seq*. regarding a claim of disparate

treatment, due to race, by his former employer.  The Defendant, EASD, had a legitimate

nondiscriminatory reason for treating the comparator, Mr. Wrazien, differently from Mr. Houston

when Mr. Wrazien was allowed to retire with payment for all of his unused sick days.  The

legitimate nondiscriminatory reason put forth by the Defendant was not a pretext for

discrimination.

Therefore, the following Order is entered:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WILLIAM HOUSTON,

              Plaintiff

    vs.

EASTON AREA SCHOOL DISTRICT,

           Defendant

Civil Action

No. 03-3494

**ORDER**

      **AND NOW**, this   24th   day of February, 2009, based upon the findings of fact and conclusions drawn therefrom, it is

      **ORDERED,** that judgment is entered for the Defendant.

BY THE COURT:

  /s/ Henry S. Perkin
Henry S. Perkin
United States Magistrate Judge